**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**CITY OF SHAWNEE, KANSAS,
D. F. FREEMAN CONTRACTORS, INC.,**

                    **Plaintiffs,**

**v.**                                                          **Case No.  06-2389-GLR**

**ARGONAUT INSURANCE COMPANY,**

                    **Defendant.**

**MEMORANDUM AND ORDER**

        This case involves a claim for insurance coverage, arising out of a liability insurance policy

issued to Plaintiff City of Shawnee, Kansas ("City") by Defendant Argonaut Insurance Company

("Argonaut").  The City has filed a motion for summary judgment (doc. 32) seeking a declaration

that the Public Officials' Liability Coverage Part of its policy covers a claim for negligent

misrepresentation, asserted against it in a law suit filed in the District Court of Johnson County,

Kansas, by co-plaintiff D. F. Freeman Contractors, Inc. ("Freeman").  Defendant has filed a cross-

motion for summary judgment (doc. 46), contending that it has no duty to defend or otherwise

provide liability insurance coverage to the City against the Freeman claim.  Defendant has also filed

a Motion to Strike the Affidavit of Paul Lindstrom (doc. 43), attached as Exhibit J to the City's First

Motion for Summary Judgment.  The co-plaintiff D.F. Freeman Contractors, Inc. has filed no

responses to the motions.  For the reasons herein stated, the Court denies the motion of the Plaintiff

City and sustains the cross-motion of Defendant for summary judgment and denies the motion to

strike the affidavit.

I.      **Facts**

The following facts are either uncontroverted, based on the evidence submitted with the

summary judgment motions and briefing, or viewed in the light most favorable to the non-moving

party.[1]  Immaterial facts and factual averments not properly supported by the record are omitted.[2]

A.      **The Claim**

In early 2003 the City issued a Notice to Bidders for construction to be performed on the

Shawnee Mission Parkway Improvement Project (the "Project").  The construction consisted of

grading, surfacing, seeding, lighting and signal work on a section of Shawnee Mission Parkway in

Johnson County, Kansas.  In soliciting bids, the City furnished Freeman and other prospective

contractors with written plans and specifications for the Project.  They indicated that certain utility

lines running under, over and adjacent to Shawnee Mission Parkway would be relocated, so as to

not interfere with the excavation and the work of the Project.  The original bid documents lacked

specific details about the utility lines and the dates for their relocation.  Addendum 1, dated June 17,

2003, provided the first written documentation, setting forth dates for relocation of the utilities.

Addendum 1 included a two-page Kansas Department of Transportation ("KDOT") Bureau of Local

Projects form, known as Form 1304, titled "List of Utilities and Status of Same."[3]  Form 1304

contained a list of utilities to be moved with their estimated completion dates.  It was "submitted by"

and signed by the City's Project Engineer, Paul Lindstrom, as "Authorized City Official" on May

---

[1]*Days Inns of Am., Inc. v. Regency Manor, Ltd.*, 94 F. Supp. 2d 1200, 1201 (D. Kan. 2000).

[2]*Id.*

[3]Ex. HH to Def.'s Cross-Mot. for Summ. J. (doc. 53-52).

5, 2003.  Form 1304 Addendum 2, dated July 3, 2003, provided no additional information about specific dates for moving utilities.

At a pre-bid meeting on July 1, 2003, there was no particular discussion about specific dates for moving utilities.  Freeman submitted its bid on July 8, 2003.  The City accepted it.  On July 14, 2003, the City and Freeman entered into a contract to perform work on the Project.

Shortly after commencing work on the Project, Freeman encountered utilities that were not listed in the bid documents and others that had not been relocated by the dates set forth in Form 1304.  On July 29, 2004, Freeman's Project Engineer/Estimator, David J. Taggart sent a letter to Paul Lindstrom, the City's Project Engineer.[4]  The letter provided a summary of the utility problems that had arisen and their effect on progress of the Project.  It also requested an extension of the completion date on the Project.  The letter further stated that Freeman "reserve[d] the right to seek additional compensation due to damages and other costs caused by these delays."[5]

On November 12, 2004, the City received another letter from Freeman, regarding "Shawnee Mission Parkway - Notice of Intent to File Claim."[6]  It stated in pertinent part that:

> Freeman bid this project in good faith with the assumption that the plans and contract documents were accurate and representative of what would be required. Quite the opposite has occurred in that the contract documents have grossly misrepresented what has been required to construct this project. As such, Freeman hereby notifies you of its claim for damages on this project. Obviously, given the fact that the project has not yet been completed, we cannot provide you with a total claim figure at this time, but when the information is available, we will forward it to you for your review and consideration.[7]

---

[4]Ex. D to Def.'s Cross-Mot. for Summ. J. (doc. 53-16).

[5]*Id.*

[6]Ex. E to Def.'s Cross-Mot. for Summ. J. (doc. 53-17).

[7]*Id.*

3

Following this correspondence, on November 10, 2004, Freeman's attorney transmitted to the City a formal request for documents "reflecting an understanding or an agreement between" the City and seven listed utility companies.[8]  The letter further stated that the request was "specifically targeted to agreements whereby the utilities undertook an obligation to relocate or move their existing lines near the current construction on Shawnee Mission Parkway."[9]

On or about November 29, 2004, the City sent a letter to Freeman in response to Freeman's July 29, 2004 request for an extension of the completion date for the project.[10]  The letter from the City stated in pertinent part:

> This last letter also refers to a claim for damages, but again does not identify your alleged costs that you attribute to utility issues and those you attribute to design issues. That information would be helpful.
>
> *          *          *
>
> It is also clear that you extended certain covenants and warranties when D.F. Freeman entered into a contract to complete the Shawnee Mission parkway improvements.  In specific, in IB-19 you warranted that the submission of a bid was an acknowledgment that your proposal took into consideration *the relocation and coordination of utilities during the calendar days commencing after the notice to proceed is issued.*  You further acknowledged and covenanted that when you prepared and submitted your bid, you took into consideration *that utility relocation during construction may increase the cost of construction.*  You then agreed to waive any claim for, and you covenanted not to *make any claims for delay, acceleration or other damages against the city because of utility work during construction.*  Contrary to your acknowledgment, waiver and warranty, you now appear to make such a claim.
>
> In GC-26 you covenanted and agreed D. F. Freeman *shall not be entitled to any damages or extra pay* on account of any postponement, interference, or delay caused by any utilities, *whether they are shown on the plans or not, specifically but not limited to delay in utility relocation.*  In Special Conditions paragraph 5, you acknowledged and agreed utilities may be present other than shown on the

---

[8]Ex. F to Def.'s Cross-Mot. for Summ. J. (doc. 53-18).

[9]*Id.*

[10]Ex. H to Def.'s Cross-Mot. for Summ. J. (doc. 53-20).

plans, and you covenanted that utility relocations may be present other than shown on the plans, and you covenanted that utility relocations *shall not constitute a claim for extra work, additional payments, extension of time, or damages.* In Special Conditions paragraph 12 you covenanted and agreed D. F. Freeman *shall not hold the City liable for claims of delay, acceleration or other related damages* arising from utility relocations.

    \*       \*       \*

You have now made, suggested, or threatened a claim that Freeman covenanted, warranted, and contracted that it would not make against the City.

    \*       \*       \*

We wish to resolve your concerns and reach a fair compromise. In an effort to reach a settlement and compromise, we will conditionally agree to suspend counting calendar days from December 1, 2004 through March 1, 2005, and to extend the contract date for completion by an additional period of 32 calendar days. Due to the claims you apparently now submit contrary to your prior covenants and representations, this offer of compromise is conditioned upon your reaffirmation that Freeman continues to covenant, acknowledge, and agree to waive and not make a claim for costs or delays associated with utility relocations, . . . .[11]

On December 7, 2004, Freeman responded to the City's November 29, 2004 correspondence and indicated that the purpose of its former letter "was not to identify any requests for a time extension but was merely a courtesy to inform you of our intent to file a claim for damages at a later date."[12] The letter further stated that:

Again, once our final assessment has been made, you will be provided with the appropriate information.

    \*       \*       \*

The fact of the matter is this: the information contained in the contract is grossly misrepresentative of the actual field conditions encountered. The City is obligated to insure that the utility conflicts are resolved expediently to avoid the delays that have been encountered. It was implied both in the contract and in subsequent correspondence that the City would diligently pursue these issues to resolve them quickly and this simply has not been done. If anyone has failed to meet certain covenants, obligations, representations or the overall "true spirit,

---

[11]*Id.* (emphasis in original).

[12]Ex. I to Def.'s Cross-Mot. for Summ. J. (doc. 53-21).

meaning, and intent of the Contract, Plans and Specifications" it has been the City of Shawnee.[13]

On December 22, 2004, Freeman sent the City another letter.  It again referred to the utility issues:

As you know, this is a federal aid project in which the utilities were expected to be moved in accordance with federal and state guidelines.  The current contract contains a status of utilities list that requires utilities to be moved as outlined in the KDOT BRUD Memo 84-10.  This memo clearly requires that utilities be moved in advance of letting the contract whenever possible, and when not possible, the project documents shall contain "specific" notes pertaining to the required adjustments.  In addition, the status of the utilities included in the contract is severely misleading as it contains a list of conflicts that is wholly incomplete and estimated completion dates for utility relocations that are in no way indicative of the actual time frames required on the project.[14]

Responding to this letter on January 7, 2005, the City advised Freeman, in pertinent part, as follows:

The information within the KDOT form 1304, that was included in the contract documents, is directly supplied by each of the related utilities and not the City of Shawnee.  Also, it clearly states on the 1304 form that the dates established by the utilities are estimated and does not give any indication that those dates are guaranteed.

*     *     *

The contract that pertains to D. F. Freeman is the two-party construction contract with the City, dated July 14, 2003.  That contract includes the 1304 form for information but the contract also contains language in several locations clearly indicating that utility relocations will be completed during construction.  The instruction to bidders section, more specifically IB-19, instructs the contractor to take this into consideration when establishing a bid price.  By the language set forth in the construction contract documents it is clear that the City was not misleading in the fact that utilities would be relocated throughout construction.[15]

---

[13]*Id.*

[14]Ex. J to Def.'s Cross-Mot. for Summ. J. (doc. 53-22).

[15]Ex. K to Def.'s Cross-Mot. for Summ. J. (doc. 53-23).

Freeman replied by letter dated January 13, 2005.  It clarified its contention as to how the City had been misleading:

> D.F. Freeman has never claimed that the City has been misleading in the fact that some utilities would need to be relocated during construction. D.F. Freeman's position is that the City's portrayal as to the extent of the conflicts, where they are located, and when they would be moved, is what has been misleading.[16]

The parties continued to exchange correspondence about the Project during April and June 2005.

On October 13, 2005, Freeman's attorney served on the City a formal request for correspondence.  It stated in pertinent part that:

> Our law firm represents Freeman Contractors, Inc., the Prime Contractor on the above-referenced project pursuant to K.S.A. 45-220 et seq. This letter serves as our formal request to the City for all e-mails, letters, and correspondence of any nature between the City of Shawnee and any of the following [utility companies]:
>
> *        *        *
>
> This request is specifically targeted to e-mails, letters and correspondence regarding the presence, movement or relocation of any and all utilities on the above-referenced Project.[17]

On March 3, 2006, Freeman filed a Petition in the District Court of Johnson County, Kansas, against the City and KDOT,[18] and on October 31, 2006, a First Amended Petition.[19]  Freeman thereby claims damages for alleged delays and disruption and false representations made during the course of business associated with its construction work on the Project.  The First Amended Petition asserts ten counts: Action on Contract; Quantum Meruit; Breach of Express Warranty; Breach of

---

[16]Ex. L to Def.'s Cross-Mot. for Summ. J. (doc. 53-24).

[17]Ex. Q to Def.'s Cross-Mot. for Summ. J. (doc. 53-29).

[18]Ex. D to Pl. City of Shawnee's First Mot. for Summ. J. (doc. 33-3).

[19]Ex. FF to Def.'s Cross-Mot. for Summ. J. (doc. 53-49).

Implied Warranty; Breach of Implied Covenant of Good Faith and Fair Dealing; Kansas Prompt Pay

Act; Negligent Misrepresentation; Fraudulent Misrepresentation; Fraud Through Silence; and

Business Disruption.  Count VII for Negligent Misrepresentation adopts and incorporates all the

allegations of the preceding claims and further alleges that, during the course of business on the

Project, the City "falsely informed and represented to D.F. Freeman that utility lines under, over and

adjacent to Shawnee Mission Parkway in Shawnee, Kansas would be properly located by the dates

set forth in the Bid Documents, but in no event later than September 1, 2003."[20]  It further alleges

that the City made the representations with the understanding and expectation that Freeman would

rely upon those representations when it estimated and submitted a price for the construction work

on the Project, and that Defendants failed to exercise reasonable care and competence in

communicating the representations to Freeman.[21]

**B.**     **The Insurance Policy**

Defendant issued a policy of insurance to the City as named insured with effective dates of

January 1, 2006 through January 1, 2007.  The policy includes a Public Officials' Liability ("POL")

Coverage Part, which provides the following coverage:

SECTION I - COVERAGES

A.     Insuring Agreement

1.     We will pay those sums that the insured becomes legally obligated to
       pay as "damages" resulting from a "wrongful act" to which this
       insurance applies.  This insurance DOES NOT apply to any claim
       resulting from a "wrongful act" which occurred in whole or in part

---

[20]Freeman First Am. Pet. ¶ 69, attached as Ex. FF to Def.'s Cross-Mot. for Summ. J. (doc. 53-49).

[21]*Id.* at Pet. ¶¶ 70, 72.

prior to the Retroactive Date shown in the declarations or subsequent to the termination of this policy.

. . .

4.    This insurance applies only if a claim for "damages" is first made in writing against any insured during the policy period or any Extended Reporting Period we provide under SECTION VI EXTENDED REPORTING PERIODS.[22]

A "wrongful act" is defined under the policy as "any act, error or omission by an insured."

"Damages" are defined under the policy as "money damages."

The policy also contains certain exclusions from coverage.  Exclusion B.5 provides as follows:

This insurance does not apply to:

\*    \*    \*

5.  A claim against any insured flowing from or originating out of a breach of contract, or liability assumed under any contract or agreement except mutual aid agreements between political subdivisions.

Exclusion B.6 further excludes a claim "flowing from or originating out of the failure to secure or maintain proper insurance or bonds, or faulty preparation of bid specifications."

The insurance is a claims-first-made policy.  It "applies only if a claim for 'damages' is first made in writing against any insured during the policy period or any Extended Reporting Period . . . ."  Under the policy "[a] claim by a person or organization seeking 'damages' will be deemed to have been made when written notice of such claim is received by an insured or by us, whichever comes first."  The policy does not define "claim."

The Conditions section of the POL Coverage Part sets forth the duties of the insured in the event of a claim or suit.  It provides in pertinent part that the insured "must see to it that [the insurer] is notified of a 'wrongful act' which may result in a claim covered by this policy as soon as

---

[22]Ex. I to Pl. City of Shawnee's First Mot. for Summ. J. (doc. 33-3)

practicable after the 'wrongful act' is known by you, one of your officers, your legal department or an employee you designate to give notice to us."  The policy further provides that "[n]otice of a 'wrongful act' is not notice of a claim."

The policy also has a Retroactive Date-Claims Made Coverage Endorsement, which extends coverage back to the Retroactive Date, subject to certain conditions and exclusions:

A.   <u>COVERAGE</u>

In consideration of the premium charged, coverage is provided for "damages" under SECTION I- COVERAGES, A. Insuring Agreement as long as a Retroactive Date is shown in the Declarations and the "wrongful act":

1.   took place in the coverage territory; and
2.   did not occur before the Retroactive Date shown in the Declarations.

B.   <u>EXCLUSIONS</u>

It is hereby agreed and understood that ITEM A. Insuring Agreement of Section I-COVERAGES will not apply to a "wrongful act" which occurred after the Retroactive date, if prior to the effective date of this policy:

1.   any Insured gave notice to any insurer of the "wrongful act," or
2.   any Insured had a reasonable basis to believe that the "wrongful act" might result in a claim or suit, or
3.   there is a prior policy or policies which provide insurance for such "wrongful act" whether or not the available limits of liability of such prior policy or policies are sufficient to pay and whether or not the deductible provisions and amount of such prior policy or policies are different from this policy and whether or not such prior policy or policies are collectible in whole or in part.

Prior to the January 1, 2006 effective date of the policy, Defendant agreed to January 1, 1996, as the retroactive date for the POL Coverage Part (Claims Made Form).

On March 16, 2006, Defendant Argonaut received notice from the City of the filing of Freeman's Petition, which had been filed on March 3, 2006.

**II.    Standard for Summary Judgment**

10

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[23]   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[24]   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[25]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[26]

The legal standard does not change if the parties file cross-motions for summary judgment.[27] Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[28]   Where, as here, the parties file cross motions for summary judgment, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to

---

[23]Fed. R. Civ. P. 56(c).

[24]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[25]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[26]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[27]*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[28]*Id.*

material facts."[29]  "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[30]

## III.    Arguments of the Parties

The City contends that Freeman's claim for negligent misrepresentation is within the definition of a "wrongful act" under the terms of the POL Coverage Part of the policy and is not within any policy exclusion.  It argues it provided timely notice of the claim, after Freeman filed its Petition in state court in March 2006.  The City maintains that Freeman's demands for additional compensation in 2004 and 2005 do not constitute notice of a claim for "damages" for a wrongful act under the policy.  The City contends that, before being served with the Petition, it did not know that Freeman would make a demand for damages that might be covered by the policy.  The City requests the Court to find as a matter of law that the alleged negligent misrepresentation is a wrongful act covered under the policy and that no exclusion applies.  The City also contends that the policy requires the insurer to defend and indemnify it against the claim for negligent misrepresentation and all other counts in the Petition.  It thus seeks damages for its cost and expenses, including attorney fees, incurred in defending against the Freeman law suit.  It also seeks recovery of its costs and expenses for pursuing this action, including attorney fees, pursuant to K.S.A. 40-256.

Defendant Argonaut contends that the material facts establish that the policy provides no coverage for the claim of negligent misrepresentation against the City.  It advances four arguments in support of these contentions.  First, it argues that the claim is excluded by policy Exclusion B.5

---

[29]*Id.* (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

[30]*Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

for a "claim against any insured flowing from or originating out of a breach of contract." Second, it argues that Freeman's claim is excluded by policy Exclusion B.6 for a claim "flowing from or originating out of . . . faulty preparation of bid specifications."  Third, referring to Insuring Agreement A.4, Defendant argues there is no coverage because the City first received a written claim for damages from Freeman prior to January 1, 2006, and thus outside the policy period. Defendant finally asserts that, prior to the effective date of the policy, the City knew that its acts, errors or omissions might result in a claim or suit, thus invoking Exclusion B.2 of the Retroactive Date-Claims Made Coverage Endorsement.  Defendant asks the Court to enter summary judgment in its favor, deny the City's motion for summary judgment, and find that no coverage exists for any claims asserted by Freeman against the City and thus no duty to defend or indemnify.

## IV.    Discussion and Analysis

### A.    Whether Freeman's claim for negligent misrepresentation against the City is excluded from coverage under the City's insurance policy as a "claim flowing from or originating out of a breach of contract," within the meaning of Exclusion B.5.

Defendant does not dispute that the alleged negligent misrepresentation is a "wrongful act" within the initial grant of coverage under the POL Coverage Part of the policy.  Defendant instead invokes either Insuring Agreement A.4. or any of three policy exclusions to avoid coverage. Defendant first invokes POL Exclusion B.5, which provides that "[t]his insurance does not apply to . . . a claim against any insured flowing from or originating out of a breach of contract." Defendant argues the underlying lawsuit clearly alleges that the claimed misrepresentations flow or originate from a breach of contract because the count for negligent misrepresentation is based upon identical allegations and seeks the same damages as the count for breach of contract.  Defendant also

asserts that, without the representations in the bid and contract documents, Freeman has no cause of action for negligent misrepresentation.

The City disagrees.  It contends that POL Exclusion B.5 does not apply because the count for  negligent misrepresentation alleges a tort, which is separate and distinct from its cause of action for breach of contract.  It points out that no policy exclusion explicitly precludes coverage for claims of negligent misrepresentation.  It also argues that the exclusion is ambiguous when applied to a tort claim for negligent misrepresentation and should be construed narrowly against Defendant insurer.

This is a diversity case.  Plaintiff City is a Kansas municipal corporation.  Plaintiff Freeman is a Kansas corporation.  Defendant Argonaut is a California corporation, authorized to transact insurance business in Kansas.  A federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules.[31]  Kansas is the forum state. Its choice of law directs the Court to look to the law of the state where the insurance policy was made.[32]  The insurance policy at issue was made in Kansas.  The Court will look to Kansas law to determine the scope of insurance coverage.

Kansas law provides that, like any other contract, the language of an insurance policy is construed to give effect to the intention of the parties.[33]  If a policy is unambiguous, the intention of the parties and the meaning of the contract are determined from the instrument itself.[34]  Under

---

[31]*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-97 (1941); *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

[32]*Safeco Ins. Co. of Am. v. Allen*, 262 Kan. 811, 822, 941 P.2d 1365, 1372 (1997).

[33]*Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 693, 840 P.2d 456, 459 (1992).

[34]*Wolfgang v. Mid-Am. Motorsports, Inc.*, 111 F.3d 1515, 1524 (10th Cir. 1997) (applying Kansas law).

Kansas law, the test for determining the meaning of the language of an insurance policy is what a reasonable person in the position of the policyholder would understand the language to mean.[35]

The insurer's duty to defend is broader than its duty to indemnify.[36]  The duty to defend arises if there is the "potential for liability," however remote, under the policy.[37]  "The insurer determines if there is a potential of liability under the policy by examining the allegations in the complaint or petition and considering any facts brought to its attention or which it could reasonably discover."[38]

An important step in interpreting an exclusion in an insurance policy is to determine if the exclusion is ambiguous.  Kansas rules of construction provide that the burden is upon the insurer to establish facts which bring the case within the exceptions set forth in the policy.[39]  As a general rule, exceptions, limitations, and exclusions to insurance policies are narrowly construed.[40]  The insurer assumes the duty to define limitations to coverage in clear and explicit terms.[41]  To restrict

---

[35]*Farm Bureau Mut. Ins. Co. v. Horinek*, 233 Kan. 175, 180, 660 P.2d 1374, 1378 (1983).

[36]*Quality Painting, Inc. v. Truck Ins. Exch.*, 26 Kan. App. 2d 473, 479, 988 P.2d 749, 754 (1999).

[37]*Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 246, 865 P.2d 182, 188 (1993).

[38]*Id.*

[39]*First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 696, 962 P.2d 515, 520-21 (1998) (citing *Buchanan v. Employers Mut. Liab. Ins. Co. of Wis.*, 201 Kan. 666, 670, 443 P.2d 681, 685 (1968)).

[40]*Marshall v. Kan. Med. Mut. Ins. Co.*, 276 Kan. 97, 112, 73 P.3d 120, 130 (2003).

[41]*Id.*

or limit coverage, an insurer must use clear and unambiguous language.[42]  Otherwise, the insurance

policy will be construed in favor of the insured.[43]

The language of an exclusion in an insurance policy, however, must also be afforded its

plain, ordinary meaning.[44] Courts should not strain to find an ambiguity when common sense shows

there is none.[45]   The court must consider the terms of an insurance policy as a whole, without

fragmenting the various provisions and endorsements.[46]

To determine whether an insurance contract is ambiguous, the court must not consider what

the insurer intends the language to mean.[47]  Instead, the court must view the language as to what a

reasonably prudent insured would understand the language to mean.[48]  This does not mean that the

policy should be construed according to the insured's uninformed expectations of the policy's

coverage.[49]  An insurance policy is ambiguous when it contains language of doubtful or conflicting

meaning based on a reasonable construction of the policy's language.[50]  An ambiguity does not exist

---

[42]*Id.*

[43]*Id.* (citing *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 327, 961 P.2d 1213, 1220 (1998)).

[44]*Bugg*, 265 Kan. at 697, 962 P.2d at 5.

[45]*Marshall,* 276 Kan. at 111, 73 P.3d at 130.

[46]*Id.*

[47]*Id.*

[48]*Id.* (citing *Bugg*, 265 Kan. at 694, 962 P.2d at 521).

[49]*Id.*

[50]*Id.*

merely because the parties disagree on the interpretation of the language.[51]   An insurance policy's failure to define each term within it does not somehow make an undefined term ambiguous.[52] "Ambiguity arises only if language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain."[53]   Where the insurance policy does not contain a definition of terms used in the policy, the terms are to be given the "natural and ordinary meaning they convey to the ordinary mind," unless contrary intent is shown.[54]

Defendant has not identified any express provision of the construction contract, and the Court otherwise finds none, that places upon the City a specific duty to relocate the utility lines. Form 1304, upon which defendant relies, contains specifications for relocation.   But it does not specifically say whether it is the City, the respective utility companies, or some other entity, who has the duty of relocation.   Conceivably under Kansas law the City may or may not have an implied contractual duty to provide such relocation.   An application of state law could lead to the following conclusion: that the specifications for utilities relocation, as set forth in Form 1304, was simply an assumption of fact or a condition subsequent, upon which both Freeman and the City relied, but to be carried out by utility companies and without imposing any contractual duty upon the City itself. The parties have not adequately briefed this particular issue, and the Court declines to prejudge it. It instead agrees with the suggestions of the City, that the issue may more appropriately be resolved in the underlying law suit before the Johnson County District Court.

---

[51]*Id.*

[52]*Harmon v. Safeco Ins. Co. of Am.*, 24 Kan. App. 2d 810, 816, 954 P.2d 7, 11 (1998).

[53]*Id.* at 816, 954 P.2d at 11.

[54]*Id.* at 812, 954 P.2d at 9.

If the state court finds that Form 1304 imposed no contractual duty upon the City to relocate the utilities, the claim for negligent misrepresentation would nevertheless arise from the alleged misinformation in the form, but it would hardly be "flowing from or originating out of a breach of contract," within the meaning of Exclusion B.5.  Under that scenario Freeman may have relied to its detriment upon the alleged misrepresentation when it submitted its bid to the City, subsequently signed the contract, and proceeded to perform it.  And its claim for negligent misrepresentation would flow from or originate out of such misinformation in the form, but not from a breach of the contract.

Given the broad allegations of the First Amended Petition in Johnson County District Court and the uncertainties as to contract interpretation, the Court finds that the claim for negligent misrepresentation could proceed to judgment and be covered under the insurance and not subject to Exclusion B.5.  It could also proceed to judgment, on the other hand, subject to the exclusion.

Because the Court cannot find as a matter of law that the exclusion applies, Defendant has a duty under the policy to defend the City against the First Amended Petition; unless the policy otherwise negates coverage for some other reason.  It would be premature for the Court now to determine if Exclusion B.5 would ultimately apply to exclude coverage for a judgment against the City.

**B.** **Whether Freeman's claim for negligent misrepresentation is excluded by Exclusion B.6 of the insurance policy as a claim "flowing from or originating out of the . . . faulty preparation of bid specifications"**

Defendant contends that Freeman's claim for negligent misrepresentation is excluded from coverage as a claim "flowing from or originating out of the . . . faulty preparation of bid specifications" under POL Exclusion B.6.  It argues that the claim is based upon the City's

18

representations contained in Form 1304 as a bid document and therefore a bid specification.

The City argues that Form 1304 is not a bid specification, but rather information provided to contractors and required to be included with the contract documents to secure federal funding for the Project.   The City suggests that bid specifications are guidelines for the contractor to follow in performing its duties for successful completion of a contracted project.

Defendant argues it is immaterial whether Form 1304 is a bid specification because the allegations of Freeman's petition determine the issue.  Paragraph 10 of the First Amended Petition, incorporated into the count for negligent misrepresentation, specifically alleges that the City provided Freeman with written plans and specifications, characterized as "bid documents." Paragraph 12 alleges that those "bid documents" included Form 1304.

Exclusion B.6 excludes a claim "flowing from or originating out of the failure to secure or maintain proper insurance or bonds, or faulty preparation of bid specifications."  The policy does not define the term "bid specifications."   The City refers to the testimony of its project manager Paul Lindstrom to define specification.  In deposition he defined the term specification as "a guideline to follow to be able to produce the product that the city is trying to accomplish"[55] and thus relates only to what the contractor must do and not to the duties of the City.   Defendant points to the allegations of the Freeman petition, on the other hand,  alleging false representations in the "bid documents" to include the faulty information in KDOT Form 1304 about location of the utilities.

Given the narrow meaning of "specification" provided by Mr. Lindstrom and the failure of the policy to otherwise define "bid specifications," the Court resolves any doubt or uncertainty of

---

[55]Lindstrom Dep. 92:4-6, May 24, 2007, attached as Ex. B to Def.'s Cross-Motion for Summ. J. (docs. 53-2 and 53-4).

definition in favor of the insured City and against the insurer.  The Court thus cannot find that the allegations of Freeman's Petition as a matter of law refer to a claim "flowing from or originating out of . . . faulty preparation of bid specifications."  Defendant has failed to show that Exclusion B.6 applies to the claim for negligent misrepresentation.

**C.     Whether Freeman's demands for additional compensation from the City in 2004 and 2005, prior to the January 1, 2006 effective date of the policy, constitute a written claim for "damages" within the meaning of Insuring Agreement A.4 of the policy**

Defendant contends that its insurance policy does not afford coverage, regardless of any exclusion, because Freeman made a written claim for damages against the City before the effective date of the policy.  It argues that the policy is a "claims-made" policy and applies only if a written claim for damages is first made during the effective date of the policy.  Defendant contends that Freeman provided the City with written notice of its "claim" on repeated occasions throughout 2004 and 2005, before the effective date of the policy, and, therefore, the policy does not afford coverage for Freeman's claim of negligent misrepresentation.  As hereinbefore noted, Section A.4 of the Insuring Agreement under Section I - Coverages provides that, "This insurance applies only if a claim for 'damages' is first made in writing against any insured during the policy period. . . ."

The City asserts that it had no knowledge before it received the Petition in the Johnson County District Court that Freeman intended to make a claim, i.e., a demand for damages that might be covered by the policy.  It contends that the Petition was the first indication of such a claim.  The City concedes it was aware that Freeman believed it should be compensated for costs incurred as a result of delays of  utility relocation and that Freeman made multiple "claims" against the City in the form of a demand for more money with regard to the Shawnee Mission Parkway project.  The City also does not dispute that "claim" means some sort of demand or assertion of a legal right, nor

that Freeman's demands on the City for more money could be described as "claims."  The City instead disputes the assertion by Defendant that "claim" refers to all demands made upon the insured, regardless of whether such demands are covered under the policy.

The City maintains that no written claim for damages covered under the policy was made before the effective date of the policy.  In support of this assertion, it offers the affidavit of Paul Lindstrom, which states, "[u]ntil the time the City of Shawnee was served with the Petition . . . on or after March 3, 2006, the City did not receive any demand from Freeman claiming damages other than a demand for additional payment under the Shawnee Mission Parkway Project contract."[56]

### 1.    *Motion to strike Paul Lindstrom affidavit*

Defendant has filed a Motion to Strike the Affidavit of Paul Lindstrom, Attached as Exhibit J to Plaintiff City's First Motion for Summary Judgment.  Defendant requests that the Court strike the affidavit upon grounds it is conclusory and self-serving.  Federal Rule of Civil Procedure 56(e)(1) provides that "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the matters stated."  Though an affidavit which fails to meet any of the three requirements is subject to a motion to strike,[57] the Court may also enforce the rule by disregarding portions of the affidavit it finds insufficient.[58]  "[C]onclusory and self-serving affidavits are not sufficient."[59]

---

[56]Ex. J to Pl. City of Shawnee's First Mot. for Summ. J. (doc. 33-3).

[57]*Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442 (10th Cir. 1968).

[58]*Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1209 (D. Kan. 2003).

[59]*Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)).

The Affidavit of Paul Lindstrom, which is Exhibit J in support of the City's motion for summary judgment, states:

1.    I am a representative of the Plaintiff, the City of Shawnee, Kansas, in this case.  The testimony in this affidavit is based upon my personal knowledge.  I am competent to testify to the matters in this affidavit.

2.    Until the time the City of Shawnee was served with the Petition in *D.F. Freeman Contractors, Inc. v. City of Shawnee, Kansas et. al.* on or after March 3, 2006, the City did not receive any demand from Freeman claiming damages other than a demand for additional payment under the Shawnee Mission Parkway Project contract.[60]

Mr. Lindstrom was the lead project engineer for the City on the Shawnee Mission Parkway project. In that position he communicated with Freeman.  Given his level of involvement in the project, the Court will treat his affidavit as made or at least purporting to be made upon personal knowledge. The Court also finds no reason to suspect, nor does Defendant Argonaut suggest, that Mr. Lindstrom is not competent to testify to the matter.

The final requirement is that the affidavit set forth facts that would be admissible into evidence.  The affidavit says that the City did not receive any demand from Freeman claiming damages other than a demand for additional payment under the Project contract.  In light of the correspondence, to which the parties have admitted for purposes of their motions, the Court can hardly ascribe to the affidavit more than a conclusion by the affiant as to when the City received any relevant demand(s) for damages.  The affidavit adds nothing of consequence to the admitted facts. The Court thus disregards Mr. Lindstrom's affidavit as simply a conclusory statement and inconsistent with those facts.  The Court denies Defendant's Motion to Strike the Affidavit of Paul

---

[60]Ex. J to Pl. City of Shawnee's First Mot. for Summ. J. (doc. 33-3).

Lindstrom (doc. 43), but will instead treat it as a "conclusory and self-serving" affidavit and without weight as against the documents admitted by Plaintiffs.

### 2. *Whether Freeman's "claim" was first made during the policy period*

The policy provides that "[t]his insurance applies only if a claim for 'damages' is first made in writing against any insured during the policy period." The policy period in this case was "From <u>01/01/2006</u> to <u>01/01/2007</u>."[61] "Damages" are defined under the policy as "money damages." The policy further provides that "[a]ll claims for 'damages' resulting from or involving the same 'wrongful act' or one 'wrongful act' will be deemed to have been made when the first of those claims is made against any insured." "Wrongful Act" is defined under the policy as:

> any act, error or omission by an insured.  All acts, errors or omissions committed by one or more insureds that are substantially the same or are in any way directly or indirectly related - - either logically, causally or temporally - - shall be deemed to constitute one wrongful act, regardless of the number of claims or claimants.

Reading these provisions together, the Court finds that the event that triggers coverage under the policy is the first receipt by the insured of a written claim for "money damages" resulting from any act, error, or omission by the insured.

The City seeks coverage for Freeman's claim of negligent misrepresentation. Paragraph 69 of the First Amended  Petition alleges that the City "falsely informed and represented" that utility lines would be properly relocated by certain dates and that the City "failed to exercise reasonable care and competence in communicating the representations." These constitute the alleged "wrongful acts," against which the City seeks coverage under the policy.  The Court must thus determine when the City *first* received from Freeman a written claim for money damages for misrepresenting that

---

[61]Ex. B to Pl. City of Shawnee's First Mot. for Summ. J. (doc. 33-3).

utility lines would be timely relocated.  A review of the written correspondence from Freeman to the City reveals that the City *first* received from Freeman a written demand for money damages for its alleged misrepresentations well before January 1, 2006, the effective date of the policy.  As early as November 12, 2004, the City received a letter from Freeman regarding "Shawnee Mission Parkway, Notice of Intent to File Claim."[62]  The letter stated, in pertinent part, that:

> Freeman bid this project in good faith with the assumption that the plans and contract documents were accurate and representative of what would be required. Quite the opposite has occurred in that the contract documents have *grossly misrepresented* what has been required to construct this project. As such, *Freeman hereby notifies you of its claim for damages on this project*. Obviously, given the fact that the project has not yet been completed, we cannot provide you with a total claim figure at this time, but when the information is available, we will forward it to you for your review and consideration.[63]

On November 29, 2004, the City responded to Freeman's request of July 29, 2004, for an extension of the project completion date.[64]  The City acknowledged that the letter from Freeman "refers to a *claim for damages*, but again does not identify your alleged costs that you attribute to utility issues and those you attribute to design issues."[65]  The City's letter further states:

> It is also clear that you extended certain covenants and warranties when D.F. Freeman entered into a contract to complete the Shawnee Mission parkway improvements.  In specific, in IB-19 you warranted that the submission of a bid was an acknowledgment that your proposal took into consideration *the relocation and coordination of utilities during the calendar days commencing after the notice to proceed is issued*.  You further acknowledged and covenanted that when you prepared and submitted your bid, you took into consideration *that utility relocation during construction may increase the cost of construction*.  You then agreed to waive any claim for, and you covenanted not to *make any claims for delay, acceleration or*

---

[62]Ex. E to Def.'s Cross-Mot. for Summ. J. (doc. 53-17).

[63]*Id.* (emphasis added).

[64]Ex. H to Def.'s Cross-Mot. for Summ. J. (doc. 53-20).

[65]*Id.* (emphasis added).

*other damages against the city because of utility work during construction.* Contrary to your acknowledgment, waiver and warranty, you now appear to make such a claim.

\*       \*       \*

In GC-26 you covenanted and agreed D. F. Freeman *shall not be entitled to any damages or extra pay* on account of any postponement, interference, or delay caused by any utilities, *whether they are shown on the plans or not, specifically but not limited to delay in utility relocation.* In Special Conditions paragraph 5, you acknowledged and agreed utilities may be present other than shown on the plans, and you covenanted that utility relocations may be present other than shown on the plans, and you covenanted that utility relocations *shall not constitute a claim for extra work, additional payments, extension of time, or damages.* In Special Conditions paragraph 12 you covenanted and agreed D. F. Freeman *shall not hold the City liable for claims of delay, acceleration or other related damages* arising from utility relocations.

\*       \*       \*

You have now made, suggested, or threatened a claim that D.F. Freeman covenanted, warranted, and contracted that it would not make against the City.

\*       \*       \*

Due to the claims you apparently now submit contrary to your prior covenants and representations, this offer of compromise is conditioned upon your reaffirmation that D.F. Freeman continues to covenant, acknowledge, and agree to waive and not make a claim for costs or delays associated with utility relocations, . . . .[66]

On December 7, 2004, Freeman sent the City another letter. It stated the purpose of its former letter "was not to identify any requests for a time extension but was merely a courtesy to inform you of our intent to file a claim for damages at a later date."[67]

On April 25, 2005, Freeman sent another letter to the City. It stated in pertinent part that:

[The City's] condition that we waive any rights to file a claim for costs associated with the delays experienced on this project is unacceptable []. Although we agree that the time extension itself is reasonable, *we will not forfeit our rights to seek*

---

[66]*Id.* (emphasis in original).

[67]Ex. I to Def.'s Cross-Mot. for Summ. J (doc. 53-21).

25

*monetary compensation for damages resulting from the City's misrepresentations and inability to fulfill its obligations and responsibilities.*[68]

On October 13, 2005, the attorney for Freeman served a formal request for correspondence on  the City related to the Project.  The letter stated in pertinent part that:

> Our law firm represents D.F. Freeman Contractors, Inc., the Prime Contractor on the above-referenced project pursuant to K.S.A. 45-220 *et seq*. This letter serves as our formal request to the City of Shawnee for all e-mails, letters, and correspondence of any nature between the City of Shawnee and any of the following [utility companies]:
>
> *       *       *
>
> This request is specifically targeted to e-mails, letters and correspondence regarding the presence, movement or relocation of any and all utilities on the above-referenced Project.[69]

On December 6, 2005, an attorney for Freeman transmitted another letter to the City.  It bears an address "**VIA HAND DELIVERY**" to "Mr. Ron Freyermuth Director of Public Works."  It bears the City's stamp for receipt on "DEC 06 2005."  The letter stated the attorney's firm had been retained to represent the interests of Freeman on the Project.  It further stated:

> Furthermore, *D.F. Freeman has made you aware on several occasions of their intent to file a formal claim* seeking additional compensation regarding delays due to a variety of issues beyond their control which were experienced on the Project. *Attached for your review is a copy of the formal claim of D.F. Freeman* regarding the above-referenced Project.[70]

The "formal claim of D.F. Freeman," attached to the letter of December 6, 2005, consists of twenty-four pages of detail. It asserts total "Additional Payment due to D.F. Freeman" of

---

[68]Ex. N to Def.'s Cross-Mot. for Summ. J. (doc. 53-25) (emphasis added).

[69]Ex. Q to Def.'s Cross-Mot. for Summ. J. (doc. 53-29).

[70]Ex. U to Def.'s Cross-Mot. for Summ. J. (doc. 53-33) (emphasis added).

$1,252,890.81, virtually identical to the prayer in the Petition for $1,252,890.  Page 23 of the

"formal claim" contains the following paragraph, entitled "Conclusions":

> D.F. Freeman reasonably relied upon contract documents in preparing its bid on the fixed date (December 1, 2004) contract with the City.  D.F. Freeman discovered that utility and design representations made in the contract were incorrect.  Utility relocations occurred over a year later than stated in the contract.  Some utility conflicts were encountered in which utilities were not shown on the drawings.  Other utilities were moved once and then came into conflict with D.F. Freeman's work later in the project. . . .  The Project was delivered in a piecemeal fashion because of the utilities and re-design by the City was a common occurrence.  These factors were never contemplated by D.F. Freeman in preparing its bid.  The City benefitted from D.F. Freeman's lower priced bid since this necessary but unbargained for work was not included in D.F. Freeman's bid.  The project was certified substantially complete on May 25, 2005.  This completion date represents an excusable delay which was only met through D.F. Freeman's considerable additional cost and effort.  Therefore, D.F. Freeman is entitled to its reasonable costs plus overhead and interest on retainage or $1,252,890.81.[71]

In light of these items of correspondence over a period more than thirteen months, the Court

finds the City first received Freeman's written demand for money damages for the alleged claim

before January 1, 2006, the effective date of the policy.  The letters from Freeman and its attorney,

from November 2004 through December 2005, constituted a written claim for "damages" first made

against the insured City before the policy period, not during it. By virtue of Paragraph A.4 under

SECTION I - COVERAGES, the policy provides that there is no insurance for the claim.

Accordingly, the Court will deny the motion of the City and sustain the cross-motion of Defendant

Argonaut.

> **D.**     **Whether the City, prior to the January 1, 2006 effective date of the policy, had a reasonable basis to believe the wrongful acts described in Freeman's Petition, might result in a claim or suit under the insurance policy and therefore exclude coverage under Exclusion B.2 to the Retroactive-Date-Claims Made Coverage endorsement**

---

[71]*Id.*

Defendant next urges the Court to find that the policy does not afford coverage under Exclusion B.2 of the Retroactive Date-Claims Made Coverage endorsement.  It argues that the City, prior to January 1, 2006, the effective date of the policy, had a reasonable basis to believe the wrongful acts described in Freeman's Petition, might result in a claim or suit under the insurance policy.

The Policy contains a Retroactive Date-Claims Made Coverage endorsement.  This endorsement extends coverage for damages under Section I of the Policy "as long as a Retroactive Date is shown in the Declarations and the 'wrongful act' took place in the coverage territory; and did not occur before the Retroactive Date shown in the Declarations."[72]  The endorsement contains three exclusions from Retroactive Date-Claims Made Coverage.

Exclusion B.2 provides that the retroactive date-claim made coverages "will not apply to a 'wrongful act' which occurred after the Retroactive Date, if prior to the effective date of this policy: . . . 2. any Insured had a reasonable basis to believe that the 'wrongful act' might result in a claim or suit, . . . ."[73]  Were the Court to assume that Freeman's Petition, filed on March 3, 2006, was the first notice of a "claim" covered by the insurance policy, the correspondence shows that the City nevertheless had a reasonable basis to believe that its allegedly wrongful act of misrepresentation about utility lines might result in a claim or suit.  A review of the correspondence between Freeman and the City, starting in November 2004 and continuing throughout 2005, clearly shows that Freeman was accusing the City of misrepresentations about utility relocation and that Freeman would seek damages arising from those alleged misrepresentations.  Freeman informed the City on

---

[72]Ex. I to Pl. City of Shawnee's First Mot. for Summ. J. (doc. 33-3).

[73]*Id.*

multiple occasions before January 1, 2006, that it believed the contract documents had misrepresented what had been required for the Project, that the representations about the utilities had been "severely misleading," and that it intended to file a claim for damages at a later date. Freeman's December 7, 2004 letter to the City stated:

> The fact of the matter is this: the information contained in the contract is *grossly misrepresentative* of the actual field conditions encountered. The City is obligated to insure that the utility conflicts are resolved expediently to avoid the delays that have been encountered. It was implied both in the contract and in subsequent correspondence that the City would diligently pursue these issues to resolve them quickly and this simply has not been done. If anyone has failed to meet certain covenants, obligations, representations or the overall "true spirit, meaning, and intent of the Contract, Plans and Specifications" it has been the City of Shawnee.[74]

On December 22, 2004, Freeman sent the City another letter, following a December 20, 2004 meeting to discuss the Project. The letter again referred to the utility issues on the Project and stated that "the status of the utilities included in the contract is *severely misleading* as it contains a list of conflicts that is wholly incomplete and estimated completion dates for utility relocations that are in no way indicative of the actual time frames required on the project."[75]

Responding to the letter on January 7, 2005, the City expressly denied the accusation that it misled Freeman with regard to the utility relocations: "By the language set forth in the construction contract documents it is clear that *the City was not misleading* in the fact that utilities would be relocated throughout construction."[76] In its letter of January 13, 2005, Freeman clarified

---

[74]Ex. I to Def.'s Cross-Mot. for Summ. J. (doc. 53-21) (emphasis added).

[75]Ex. J to Def.'s Cross-Mot. for Summ. J. (doc. 53-22) (emphasis added).

[76]Ex. K to Def.'s Cross-Mot. for Summ. J. (doc. 53-23) (emphasis added).

its position that the City's "portrayal as to the extent of the conflicts, where they are located, and when they would be moved," was what had been misleading.[77]

Given this correspondence, the Court concludes that the City, prior to January 1, 2006, the beginning effective date of the policy, had a reasonable basis to believe the wrongful acts described in Freeman's Petition, i.e., that the City falsely represented to Freeman that utility lines would be properly relocated by the dates set forth in the Bid Documents, might result in a claim or suit under the insurance policy.  As such, Exclusion B.2 to the Retroactive-Date-Claims Made Coverage bars coverage of Freeman's claim for negligent misrepresentation.

The City argues that it acted reasonably in reporting the Freeman suit to Defendant upon receipt of the Petition in absence of the complete policy provisions.  The City points out that it operated without the complete insuring agreement for the first three months of the policy period and it did not have the actual policy to which it could refer for specific provisions and procedural requirements until well after the Freeman suit was filed.  It argues that Defendant's delay in issuing the final policy is another reason why the policy should be read favoring a finding of coverage.

The delay in issuing the final policy, however, does not change the outcome.  The binders issued to the City incorporate the terms, conditions, and exclusions of the Policy, including POL Exclusion B.5 and B.6 and Exclusion B.2 of the Retroactive Date-Claims Made Coverage endorsement to the POL.  Debbie Kelly, the City's accounting manager who was in charge of procuring insurance for the City, was provided with a specimen part of Defendant's POL Coverage Part policy prior to January 1, 2006.  She testified that she had samples of the POL policy prior to

---

[77]Ex. L to Def.'s Cross-Mot. for Summ. J. (doc. 53-24).

January 1, 2006 and that she knew there would be exclusions from any coverage. [78]   Additionally, the Proposal for Insurance Brokerage Services, dated December 7, 2005, prepared by the City's insurance procurement agent, included a specimen of the policy, including the POL Coverage Part.[79]

## V.   Summary

In summary the Court makes the following findings and rulings:

Defendant issued to the City, as insured, a policy of liability insurance.  As part of the Insuring Agreement of the policy, Section I A.1 provides that the insurer "will pay those sums that the insured becomes legally obligated to pay as 'damages' resulting from a 'wrongful act' to which this insurance applies."

A First Amended Petition, filed in Case. No. 06CV01682 in the District Court of Johnson County, Kansas, asserts *inter alia* a claim by Freeman against the City for damages resulting from the City's alleged negligent misrepresentations as to utility relocations.  Unless otherwise negated by the policy, Freeman's claim qualifies for coverage as one for damages allegedly resulting from a wrongful act in providing misinformation about the relocation of utilities, relevant to a construction contract to which Freeman and the City are parties.

Exclusion B.5 of the insurance policy provides that the insurance does not apply to "[a] claim against any insured flowing from or originating out of a breach of contract . . . ."  From reviewing the First Amended Petition filed by Freeman, the construction contract, and other undisputed contract documents, the Court finds Exclusion B.5 may apply to the Freeman claim for negligent

---

[78]Kelly Dep. 75:1-5, 76:16-21, May 24, 2007, attached as Ex. W to Def.'s Cross-Mot. for Summ. J. (doc. 53-35).

[79]Ex. BB to Def.'s Cross-Mot. for Summ. J. (docs. 53-41 & 53-42).

misrepresentation.  But at this point the Court cannot as a matter of law determine whether the exclusion applies.  Such determination would depend upon the interpretation placed upon the construction contract in the underlying law suit filed by Freeman in state court.  If the City had such a contractual duty, the claim for negligent misrepresentation may indeed be one "flowing from or originating out of a breach of contract" and subject to Exclusion B.5.  If the City had no such duty, however, the exclusion may not apply.   Because the Court cannot at this point find as a matter of law that the exclusion applies, Defendant has a duty under the policy to defend the City against Freeman's First Amended Petition; unless the policy otherwise negates coverage for some other reason.

Exclusion B.6 of the insurance policy excludes coverage against a claim "flowing from or originating out of . . . faulty preparation of bid specifications."  Given the restrictive definition of "specification" by a witness and the absence of a definition in the policy, the Court cannot determine that as a matter of law the exclusion applies.  Defendant has failed to meet its burden to show that as a matter of law the exclusion applies to the Freeman claim for negligent misrepresentation.

Under Section I - Coverages, Section A.4 of the Insuring Agreement provides that, "[t]his insurance applies only if a claim for 'damages' is first made in writing against any insured during the policy period or any Extended Reporting Period . . . ."  Exclusion B.2 of the Retroactive Date endorsement to the policy similarly excludes coverage, "if prior to the effective date of this policy . . . any insured had a reasonable basis to believe that the 'wrongful act' might result in a claim or suit . . . ."  The policy period was "From 01/01/2006 To 01/01/2007."  The effective date of the policy was therefore January 1, 2006.

The undisputed documents show that on four occasions between November 12, 2004, and December 6, 2005, well before the policy period and the effective date of the policy, Freeman asserted by written correspondence to the City its claim for damages for misrepresenting the relocation of utilities.  The documents also include written responses of the City, addressing the claim.  They further show that the City as the insured "had a reasonable basis to believe that the 'wrongful act' might result in a claim or suit."   For these reasons the Court finds that the insurance provided by Defendant Argonaut does not cover the claim of negligent misrepresentation in the case filed by Freeman in the District Court of Johnson County, Kansas.  Accordingly, the Court will deny the motion of the City and sustain the cross-motion of Defendant Argonaut for summary judgment. The Court finds, therefore, that Defendant Argonaut has no duty under its insurance policy either to defend the City or to satisfy any judgment against the City upon the claims asserted by Plaintiff Freeman in the First Amended Petition in Case No. 06CV01682 in the District Court of Johnson County, Kansas.

**IT IS THEREFORE ORDERED THAT** Plaintiff City of Shawnee's First Motion for Summary Judgment (doc. 32) is denied.

**IT IS FURTHER ORDERED THAT** Defendant Argonaut Insurance Company's Cross-Motion for Summary Judgment (doc. 46) is sustained and that Defendant has no duty under its insurance to defend or to satisfy any judgment upon the claims asserted in the First Amended Petition by D.F. Freeman Contractors, Inc. against The City of Shawnee, Kansas, in Case No. 06CV01682 in the District Court of Johnson County, Kansas.

33

**IT IS FURTHER ORDERED THAT** Defendant's Motion to Strike the Affidavit of Paul Lindstrom, Attached as Exhibit J to Plaintiff City's First Motion for Summary Judgment  (doc. 43) is denied.

**IT IS FURTHER ORDERED THAT** Defendant's Request for Oral Argument (doc. 48) is denied.

Dated in Kansas City, Kansas on this 28th day of March, 2008.

s/ Gerald L. Rushfelt
Gerald L. Rushfelt
United States Magistrate Judge
